### SARGENT BARGE LINE v. NEW YORK SILK DYEING CO., Inc., et al.

No. 12849.

District Court, E. D. New York.

March 20, 1933.

Purdy & Purdy, of New York City (Edmund F. Lamb, of New York City, of counsel), for libelant.

Alexander, Ash & Jones, of New York City (Edward Ash, of New York City, of counsel), for respondent New York Silk Dyeing Co., Inc.

Thomas A. McDonald and Franklin M. Depew, both of New York City, for Jeuck.

INCH, District Judge.

The respondent New York Silk Dyeing Company, Inc., maintains a dock at Tenth street, College Point, in this district, where it received from time to time cargoes of coal consigned to it.

Libelant's barge Elsie with a cargo of coal consigned to said respondent arrived at this dock the morning of September 9, 1931, and was unloaded.

While the barge was at this dock it was damaged by contact with a half sunken float or raft. Libelant sues for such damage.

The original libel was against the respondent and two individuals, one George Jeuck and one Ike Isaacs.

Subsequently, libelant, by order, was permitted to file an amended libel. The case against Jeuck, the owner of the raft, was discontinued, at the trial, by consent, while Isaacs defaulted, and his default was duly noted.

The facts briefly are as follows: The coal boat Elsie was about 12 years old. She was about 100 feet long. Her capacity for a full load was 600 tons of coal. At the time of the accident she was carrying 236 tons and was drawing about 4 feet. Her sides were

about 13 feet 6. Her bow was a "cutaway" to the extent of about 4½ or 5 feet. Her master was named Wedell.

About 9 o'clock in the morning, September 9, 1931, at high water, the Elsie arrived at the coal dock of the silk company, carrying this load of coal consigned to it and was placed with her portside against the dock. Apparently she was in good condition.

This dock extended about 10 feet on each side of the Elsie. The position of the Elsie placed her stern about 12 or 15 feet from what is called Kramer's dock, while her bow pointed to the end of the respondent's dock. About opposite this end, but in front of the property of another party, there lay, substantially submerged, a raft or pontoon. This raft was held in place by a line from a ring at the end nearest to the Elsie to the property in front of which it lay. The raft was approximately 43x19 feet. However, even at high water, sufficient of the raft appeared to indicate her presence.

In fact there is no difficulty in finding that all concerned knew at once, when the Elsie arrived, of the presence of this raft. This is not a case of some hidden or unsuspected obstruction.

The Elsie was thus berthed alongside this dock with a space of at least 6 feet between her bow and the raft, or almost 12 feet between her bottom and the raft, while her stern was approximately 12 feet from Kramer's dock.

The Elsie remained in the position described the rest of the day, and through the tides, without incident.

The silk company had previously hired the stevedore Isaacs by contract at 50 cents a ton, and he and his gang were present. The Hamburg (C. C. A.) 204 F. 590; The Teno (C. C. A.) 47 F.(2d) 197.

Isaacs and his workmen proceeded to start her unloading by means of a bucket on the end of a boom attached to a mast stationed on the dock which bucket would reach about to the middle of the Elsie. They started the unloading at the second stern hatch.

Wedell, her master, when he first arrived and saw this raft off his bow and observed the berth given to his boat was apparently satisfied that it was safe, for he inquired from the superintendent of the silk company, Mr. Williams, "if it were safe to get too close to this raft." "He told me I should keep clear of it, leave enough of room so I would not hang up on it." Wedell thereupon let his boat stay there.

The following morning September 10, about highwater, and apparently in order to work the bucket nearer the stern, the Elsie was shifted a short distance forward, and when the tide fell about 2 o'clock in the afternoon it was found that the port bow of the Elsie "was up against this sunken raft."

Wedell then spoke to Isaacs and they endeavored to move the Elsie back, but as her stern was aground, due to low water, "we could not budge her." During that time certain planks in her bow "about 3 feet up on the bottom" were damaged. Later that night when the tide rose they succeeded in getting the bow off the wreck.

It is for this damage, as well as for the damage that subsequently occurred, that this suit is brought.

It is clear from the testimony that, if the Elsie had not been moved, she would not have run on this raft. It was the shifting of her position towards this raft that caused the contact. The raft did not move.

The testimony shows how this shifting was done.

Wedell says: "They moved the boat by a line to the dock. I gave a hand. I don't know who ordered it to be shifted."

Not only does this active participation appear, but it also appears that Wedell had been previously warned of this danger, for he says: "At that time I spoke to the superintendent Mr. Williams, I could see a corner of the sunken boat above the water, the inshore corner—not quite a foot, my boat was made fast. I asked him if it was safe to move the boat down, he replied, I will leave it up to the fellows who are working on the boat. I had no further conversation."

Thereupon Wedell helped to move his boat forward, and she ran her bow so that it subsequently rested upon the raft.

█ There is no difficulty in deciding what the law is as to the duty resting on the consignee and wharfinger such as the silk company was. It must use reasonable care to provide a safe berth and give due notice of the known existence of any dangerous obstruction. United States Trucking Corp. v. City of New York (C. C. A.) 18 F.(2d) 775 and cases cited. Kenny v. Venetian, etc., Co. (D. C.) 60 F.(2d) 1053, and cases cited.

█ The burden of proof to show that there was negligence or a violation of this duty rested upon libelant. Such proof must fairly preponderate in its favor.

Bearing this in mind, it seems to me that libelant has failed to prove a case against the silk company.

On the contrary, the testimony shows that the silk company performed its duty, and that the master of the barge, without protest, and the stevedore carelessly shifted the Elsie upon a known obstruction against which the master had been expressly warned. Dailey v. Carroll (C. C. A.) 248 F. 466; Hastorf v. F. R. Long-W. G. Broadhurst Co. (C. C. A.) 239 F. 852; Cary Brick Co. No. 8 (D. C.) 34 F.(2d) 981.

The next accident to the Elsie occurred several days later. It resulted from a situation not exactly the same as that already mentioned but again showing careless participation by this master in the shifting which tended to cause, if he did not, in fact, entirely cause, this second damage to the barge.

Following the incident on September 10, the Elsie was turned around several times at this dock without mishap, apparently to better unload her. At the time she sustained her second damage she had been turned stern towards this raft. Again she was allowed by the master and the stevedore to run into this raft. There is considerable conflict in the testimony. The witness for the libelant, Wedell, fails to furnish that credible testimony on which a court must rely. His recollection for some reason or other is confused and unreliable.

"Q. Who was directing which lines were to be made fast and which lines were to be thrown off and which lines were to be shifted? A. I was.

"Q. You were in charge of the shifting and the other men were helping you, isn't that right? A. No. I was not in charge.

"Q. You were telling them what to do, weren't you? A. Yes, sir, which to take off.

"Q. And which lines to make fast? A. Yes, sir.

"Q. And when to slacken them? A. Yes."

It is sufficient to say that libelant has failed to show by a fair preponderance that an unsafe berth or any negligence on the part of the silk company employees was the proximate cause of this second damage.

For the above reasons the libel must be dismissed as against the silk company and half damages allowed against the stevedore.

If this opinion is not considered a sufficient compliance with the rule 46½ of the Admiralty Rules (28 USCA § 723), findings of fact and conclusions of law in accordance herewith may be submitted.